# IN THE COURT OF APPEALS OF IOWA

No. 23-0868
Filed September 4, 2024

**IN THE MATTER OF THE ESTATE OF BETTY JACKSON, Deceased.**

**MIKE JACKSON and JOANN CALLISON, Co-Executors of the ESTATE OF BETTY JACKSON,**
     Appellants.
_____

Appeal from the Iowa District Court for Clarke County, Brad McCall, Judge.

Co-executors appeal from a ruling establishing purchase terms for real property owned by an estate. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Matthew J. Hemphill of Bergkamp, Hemphill & McClure, P.C., Adel, for appellants.

Fred L. Dorr of Wasker, Dorr, Wimmer & Marcouiller, P.C., West Des Moines, for appellees.

Considered by Schumacher, P.J., and Ahlers and Langholz, JJ.

**AHLERS, Judge.**

Betty Jackson died testate in 2021. Her will named her four children—Mike, Joan, Lyle, and Charles—as beneficiaries, established a trust benefitting her children, and named Mike and Joan as co-executors. The dispute that leads to this appeal concerns an Arizona residential property Betty owned at the time of her death.

Article VI of Betty's will addresses the Arizona property. In relevant part, it states:

> I direct that my son Charles Jackson be given the right to purchase or rent the house in Arizona . . . . Rent shall be $15,000 per year which will be deducted from his [a]nnual [t]rust payment. He shall also have the right to buy said property for the sum of two (2) times the assessed value or the appraised value for my estate, whichever is lower. The property will be sold if Charles Jackson fails to pay rent or upon the termination of the [t]rust.

Charles had lived in the property for several years prior to Betty's death. The co-executors had the property appraised. The appraiser determined the home was in poor condition, noting various aspects of the house in need of repair. The appraiser appraised the property at $390,000 in its current condition but opined it would be appraised at $515,000 if it was in "average saleable condition." A dispute developed between the co-executors and Charles as to how Article VI of the will should be carried out and how the poor condition of the property should impact the purchase price.

The parties submitted the dispute to the district court, which held an unreported hearing on the issue. In a subsequent written ruling, the court determined that (1) Charles's obligation to pay rent began the day Betty passed away and "shall continue through July 1, 2022," the date Charles had offered to

pay $390,000 for the property; (2) Charles may still elect to purchase the property; (3) "[t]he purchase price shall be $415,000.00"; (4) if Charles decides against buying the property but wishes to rent it, then he may do so pursuant to the terms established by Betty's will; (5) Charles shall be responsible for $25,000 of damages to the Arizona property; (6) the estate and trust are also responsible for $25,000 of the damage to the Arizona property; and (7) Charles shall have a credit of $23,750 applied to the purchase price of the property to account for the difference between the $45,000 already withheld from his trust distributions for rent and the $21,250 due for the period between Betty's death and July 1, 2022.  Then the court set out three different financing options for Charles to purchase the Arizona property.

The co-executors appeal.  They argue the court erred by (1) setting the purchase price of the Arizona property at an amount not supported by the appraisal or an assessed value as required by Article VI of Betty's will; (2) prematurely terminating Charles's obligation to pay rent on the Arizona property; (3) creating three financing options for Charles to purchase the Arizona property; and (4) holding the estate responsible for some of the damage to the Arizona property.

Our review is de novo.  *See* Iowa Code § 633.33 (2021) (establishing all probate proceeds other than those "to set aside or contest wills, for the involuntary appointment of guardians and conservators, and for the establishment of contested claims" are tried in equity); Iowa R. App. P. 6.907 (recognizing "[i]n equity cases review is de novo"); *see also In re Est. of Rogers*, 473 N.W.2d 36, 39 (Iowa 1991) ("A declaratory judgment action to interpret a will is tried in equity, and our review is de novo.").

We begin by highlighting our principles that guide our interpretation of wills. Those are:

> (1) the intent of the testator is the polestar and must prevail;
> (2) this intent, however, must be derived from (a) all of the language contained within the four corners of the will, (b) the scheme of distribution, (c) the surrounding circumstances at the time of the will's execution and (d) the existing facts;
> (3) we resort to technical rules or canons of construction only when the will is ambiguous or conflicting or the testator's intent is uncertain. In determining intent, the question is not what the testator meant to say, but rather what is the meaning of what the testator did say.

*In re Est. of Roethler*, 801 N.W.2d 833, 842 (Iowa 2011) (quoting *Rogers*, 473 N.W.2d at 39). We address the co-executors' challenges in order.

## I. Purchase Price of Arizona Property

Referring to the Arizona property, Article VI of the will states that Charles could "buy said property for the sum of two (2) times the assessed value or the appraised value for my estate, whichever is lower." There is no evidence of the assessed value in the record, and no one suggests that two times the assessed value is lower than the appraised value. So the parties are in agreement that the appraised value is the applicable purchase price if Charles exercises his purchase option. The record contains the appraisal ordered by the co-executors. That appraisal valued the Arizona property at $390,000 in its current condition but noted it would be worth $515,000 if in better condition. The district court set the appraised value of the property at $415,000.

The co-executors contend that Charles is obligated to pay $515,000 for the property to exercise his purchase option because that would be the value if it were in "average saleable condition." They contend that the property's poor condition

was caused by Charles's lack of stewardship and argue the district court should have set the purchase price at the higher $515,000 value.

The co-executors' argument adds language to the will that is not there. The will says nothing about setting the sale price on Charles's option to purchase the property based on the condition that the property could be in. It sets it based on the appraised value. There is no dispute that the appraised value of the property is $390,000—not the $515,000 value it would have with imagined repairs or improvements. So, based on the unambiguous terms of the will, we conclude that the district court did not err in declining to set the purchase price at $515,000. *See In re Est. of Hamilton*, 467 N.W.2d 801, 803 (Iowa 1991) (prohibiting the court from modifying clear and unambiguous terms of a will). We note that the district court also did not set the purchase price at $390,000—the undisputed appraised value of the property and thus the option price required by the will. However, Charles does not challenge the $415,000 purchase price set by the district court, and he did not cross-appeal to make such a challenge. So, we do not disturb the purchase price set by the court. *See Boyd v. Boyd & Boyd, Inc.*, 386 N.W.2d 540, 544 (Iowa Ct. App. 1986) ("A party that neither appeals nor cross-appeals can have no greater relief or redress on appeal than was accorded it by the trial court.").

## II.     Duration of Rental Obligation

The co-executors next challenge the district court's declaration that Charles owed rent only from the date of Betty's death to the date when Charles offered to purchase the Arizona property. We agree with the co-executors that nothing in the will provides for the termination of Charles's rental obligation at the time he offered to purchase the property. Instead, following the terms of the will, we conclude that

Charles's rental obligation extends from the date of Betty's death to the date he completes the purchase of the property or until his rent obligation ends for some other reason should Charles not purchase the property.

## III.     Financing Options

The co-executors also challenge the district court's decision to give Charles three financing options for his purchase of the Arizona property.  The district court established these three options: (1) "Charles may obtain a loan from a commercial lender"; (2) Charles "finance the purchase under the same terms which Mike Jackson is purchasing agricultural real estate belonging to the decedent and provided for in the will"[1]; or (3) Charles "have an amount withheld from his annual distribution, in an amount equal to the amortization of the total amount owed, plus interest, over the term of the [t]rust."

The co-executors argue that establishing these three purchase options effectively rewrote Betty's will by adding terms.  We agree.  The will provides none of the financing provisions created by the district court.  Therefore, we vacate that part of the district court's ruling establishing financing options for Charles's purchase of the Arizona property.  It is Charles's obligation to figure out a way to meet his financial obligation to purchase the Arizona property should he exercise his option.

---

[1] Article V of Betty's will stated: "My son, Mike Johnson, has purchased on contract the following described real estate [legal description of the real estate provided]. The balance of said contract at the time of my death shall be paid to my Trust as per the terms of the contract."  The terms of Mike's contract to purchase this land is not in the record.

**IV.      Responsibility for Damage to the Arizona Property**

The co-executors also contend that the district court incorrectly determined that the estate should be responsible for $25,000 in damages to the Arizona property. Again, we agree. This record contains no evidence of the cost of restoring or repairing the property, who caused any decline in the condition of the property, or who is legally responsible to maintain or repair the property. This probate proceeding is not the proper vehicle to resolve those issues. Resolving them is a separate matter between the estate and Charles.

**V.      Conclusion**

We vacate the part of the district court's ruling declaring that Charles's rental obligation ceased when he offered to purchase the property for $390,000. Charles's rental obligation will continue until he closes on the purchase of the property should he elect to purchase it or until his rental obligation ends for some other reason should Charles not purchase the property. We also vacate the part of the district court's ruling establishing financing options for Charles to purchase the Arizona property. Also, we vacate the part of the district court's ruling that assesses partial responsibility for damage to the Arizona property to the estate because the record does not contain evidence establishing the cost of restoring or repairing the property, who caused any decline in the condition of the property, or who is legally responsible to maintain or repair the property.

We affirm the part of the court's ruling setting the price for the exercise of Charles's option to purchase the Arizona property at $415,000. But, because we have vacated the parts of the ruling ending Charles's rental obligation prematurely, we also vacate that part of the district court's order that adjusts the $415,000

purchase price for purported overpayment of rent. If Charles exercises his purchase option, the purchase price shall be $415,000, as set by the district court, with no adjustments based on Charles's rental obligations.

We remand to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**